## LA DU *v.* LA DU.

DIVORCE—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.

In a suit by a wife for divorce evidence *held*, insufficient to warrant a decree in her favor on the ground of extreme cruelty.[1]

Appeal from Ingham; Collingwood, J. Submitted

---

[1] On relations existing between one spouse and relatives of other as affecting question of desertion or cruelty, see notes in 13 L. R. A. (N. S.) 222; 34 L. R. A. (N. S.) 758; L. R. A. 1915E, 161.

On the question of failure to support as cruelty in action for divorce, see note in 43 L. R. A. (N. S.) 260.

April 5, 1917.   (Docket No. 51.)   Decided September 27, 1917.

Bill by Mabel G. La Du against Bert N. La Du for a divorce. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Rhoads & Reynolds,* for plaintiff.

*C. W. & W. S. Foster,* for defendant.

STEERE, J. The parties to this suit are husband and wife. Plaintiff filed her bill of complaint in the circuit court of Ingham county in chancery to obtain a divorce from defendant on the grounds of extreme cruelty, failure to properly provide for her, and neglect. Defendant filed an answer of denial and cross-bill, asking a divorce from plaintiff on the ground of extreme cruelty in charging him with extreme cruelty as set out in her bill of complaint, to which she filed answer of denial and reaffirmance of her charges. The testimony was taken in open court, and makes a record of ample proportions. At conclusion of the evidence and submission of the cause, the trial court pronounced it "in many ways a most unusual case," commented in kindly tenor on the testimony, showing that "both parties are of a high grade of morality and conduct in every way," offered the suggestion that plaintiff was of such extremely sensitive nature that perhaps the conduct of others caused her pain when not so intended, intimated that the really cruel aspect of the case was destroying their domestic happiness and breaking up their home by permitting petty differences to keep them apart, found that the facts relied upon as ground of divorce did not, as a matter of law, sustain the charges of extreme cruelty made by either, and decreed dismissal of both bill and cross-bill, from which plaintiff has appealed to this court.

Both parties were and are residents of Lansing. They had known each other for about two years prior to their marriage, which took place at the home of her parents on May 5, 1909. Both are shown to be reputable persons, of good families and good character. She is a graduate of the Ypsilanti Normal Conservatory of Music and an accomplished musician. She at times taught music both before and after her marriage. He was and is favorably regarded by his employers and associates as a competent and trustworthy man in the business world, his employment being in the sales departments of manufacturing institutions. When married he was a traveling man in the employ of the Olds Gas Power Company, earning a fair salary and had saved a few hundred dollars. At the time this case was tried he was in the employ of the Reliance Engineering Company, in charge of engine sales and service work, on a salary of $166 per month. During their married life he, or they together, had acquired household effects, valued at about $600, their home valued at over $4,600, incumbered by a mortgage of $200, also another house and lot valued at $2,200, with an incumbrance of $1,200. Title to the real estate was taken and stands in their joint names as tenants by the entireties. They have no children.

Immediately after their marriage they took a trip to California and were gone about three months. On their return they stayed two or three months at her parents' home, and then settled down to housekeeping by themselves, first in apartments and later in their home on Pine street. While yet living in the apartments plaintiff passed through a serious illness resulting from childbirth which detrimentally affected her health thereafter. The infant did not survive.

Plaintiff was an only child, and soon after they settled in their own home on Pine street her parents removed there also, under arrangements then mutual-

ly satisfactory to all parties, and remained there near three years. They eventually left because of a growing lack of cordiality between them and defendant, which culminated in a disagreement over the removal of some ashes from the cellar. The probability of some such termination of the two families living in one house is sounded in the testimony of plaintiff's mother, who stated she had noticed a coolness in defendant's conduct towards her daughter as early as when the young folks were with them, and felt that he did not really like herself, but she and her husband went at their suggestion, and states:

"For the welfare of my daughter I moved into a house with a man I knew I did not like, or my husband."

After the parents moved to a separate house plaintiff freely and frequently visited them with the knowledge and consent of defendant, but said she did not ask him to go with her "because the feeling was so I thought it would not be wise," although he subsequently bought Christmas presents for her parents and asked her to deliver them, which she stated she did not do because she felt they were not given in a Christmas spirit. That the dislike of her mother for defendant and lack of cordiality between him and her parents put her in a trying position, and became a disturbing factor in this case, seems very manifest, and an examination of the testimony with reference to that feature discloses much running through the record, confirming the conclusion of the trial court "that from the evidence produced the parties would now be living together if it were not for the interference of the parents of plaintiff."

On August 21, 1915, plaintiff left her husband and went to her parents, refusing thereafter to return to her own home and him. She left when their relations were apparently pleasant and there was no disagree-

ment or friction. She went with his knowledge and approval, temporarily as he supposed, to visit her mother, as she frequently had done before. They had then recently been on their vacation, taking an automobile trip north with some friends to Clifford Lake. Plaintiff testified that during this trip they had an enjoyable time, and everything was pleasant between herself and defendant; that the evening of the day following their return she gave a dinner for the party, at which everybody seemed to have a good time and defendant was agreeable. This was the week of his summer vacation, and he was free to remain at home. She states:

"That week he was helping I think about the house a little, a little more than usual, because he had the time."

The morning following this dinner she was not feeling well, but wanted to do some ironing, and defendant remained around the house assisting her. In the afternoon they attended the theater together at his suggestion. She complained of not feeling well during the performance, and at its conclusion expressed her intention of going to her mother's. He testifies that he told her, when she complained of feeling unwell, that he—

"would be glad to go with her and look after her and get medicine, and she said she thought she had better go down home; that is, to her mother's."

This she does not deny. He accompanied her to the street car. She testified that when she left him she promised to call him up later, which she did, telling him she was not feeling any better, and would stay at her parents' that night, to which he answered, "All right, stay; it is all right with me;" and requested her to call him up again in the morning, but she was unable to do so, owing to her condition. Not hearing

from his wife the next morning as he expected, defendant attempted to call her up. He testified that the call was answered by her father, who replied with a brief negative to the inquiry if she could come to the phone, and, when asked why not, answered she was sick, apparently then hanging up the receiver, as defendant could get no further response; that subsequent calls by him upon that day and the next were answered by the mother, who replied briefly to his inquiries and offers of service that his wife was ill, but had good care, and there was nothing desired of him. In answer to his question she told what physician had attended plaintiff. Asking again that he be called if there was anything he could do, defendant thereafter interviewed the physician as to his wife's condition, and enlisted a mutual friend to make inquiries for him by telephone, but for a time refrained from personally calling; deterred, as he claimed, by the fact that his efforts were rebuffed and his offers rejected by her parents at whose house he was *persona non grata*. Plaintiff remained ill at her parents' home for a time, seriously as she states, the doctor diagnosing her case as scarlet fever on his first call, owing to her being broken out, but on the next visit he said to her:

"No, you have no more scarlet fever than I have; it is broken down nerves, you have all gone to pieces."

One of her charges of extreme cruelty is defendant's neglect of her during this illness. It is undisputed that he was solicitous as to her and with offers of assistance tried to keep in touch with her, telephoning from time to time and, eventually, calling at the house, more than once. The number of times he called and manner in which he was received is not made clear, but she testified on cross-examination that he called and saw her once while she was ill, kissed her when he came into the room, asked when she was coming home, requested her to call him up the first time

she was down stairs, relating the conclusion and sequence of the interview as follows:

"He said, 'Is there anything you want?' I said, 'No.' He said, 'Is there anything you want, anything I can do; call me up or let me know'—something of that sort, and he left me.  *  *  *  When he came to see me that day I said, 'I expected you to see me before, Bert.' He said he did not know whether to come or not. Then I called him over the telephone again— no, he called me over the telephone, and said I had not called him as I said I would. ·I told him no, I did not call him because I felt if he was really interested he would call me or let me know he was interested in some way, and that was about all our conversation amounted to over the telephone."

That evening, as she states, she wrote him "a nice long letter," of which she kept a copy, detailing in graphic and far from complimentary terms his shortcomings and her grievances as she saw them, at the conclusion of which she informed him she felt she had "come to the end of the road. Our paths must part, we must go in different directions."

This he did not answer, traverse, or deny to her, but in a conversation over the telephone admitted in reply to her inquiry that he had received it, and said he was surprised. She states that the next time she saw him after sending the letter they met in the post office and had a short conversation, in which he told her it was hard for him to be alone, and he wished she would come home. Her letter was written on September 3d and on September 25th this suit was begun. Defendant, however, continued his efforts to induce his wife to return to him, finally seeking the intervention of mutual friends and relatives of hers, including her uncle, who had known both of them for years and her since childhood, and the pastor of the church which she attended. Several of these parties, undisputedly old friends and well-wishers of both, apparently actu-

ated by no sinister motives, some of whom were not even cross-examined, testify to her telling them she had no ground for divorce, that she desired to return to her husband and home, and would do so but for the objection of her parents, particularly her mother. Their testimony to that effect is emphatic and convincing. His efforts were partially successful, and they met by appointment at the home of a cousin of plaintiff, where they visited together with manifestations of mutual affection, reconciled their misunderstandings, and it was agreed that she would return to him. They arranged for her to join him soon in their own home, and that the first Sunday after they resumed living together her father and mother should be invited over to dine with them, and defendant would then propose, as she states, "that bygones be bygones." They separated with expressions of endearment, and she returned temporarily, as was then understood, to her parents, but for reasons upon which the testimony is at variance, the arrangement was not carried out, and this suit was thereafter pressed. This failure to consummate their reconciliation, or the intervention of her parents in opposition to it, are only material and competent to consider here to the extent her then conduct and admissions bear upon her subsequent testimony.

Many of plaintiff's charges of cruelty range in a field of delicate consideration and sentiment beyond the commonly recognized scope of legal relief. In that aspect it may be conceded that as to certain of the amenities they tend to relegate defendant to that unfortunate but not uncommon type of husbands who fail to rise to the prenuptial ideals of their wives. She tells of noting a change in his demeanor after marriage, and of her first awakening to this reality, while they were yet living at her parents', in the following incident:

"Mr. La Du suggested that we go out for a walk one evening, and he said to me—it had been raining —and he said I had better wear my rubbers. I said 'All right, will you kindly bring them to me?' And he seemed very much surprised, and said, 'Why, can't you wait upon yourself?' I said, 'Yes, I can,' and I went and got my rubbers. It was a small matter, but it hurt me very much because Mr. La Du had been very kind and wanted to do everything he could for me until that time. It was quite a shock to me and hurt me very much. * * * That was what I call my first disappointment."

Other incidents of somewhat similar bearing are related by her as showing neglect and lack of affection. She, however, acquits defendant of most of the more glaring and familiar acts of extreme cruelty with which the courts are accustomed to deal, testifying of him on cross-examination in part as follows:

"Mr. La Du was not given to drinking to excess, nor gambling to my knowledge, nor swearing, nor cursing at me. He did not strike me. He did not threaten to strike me. He did not choke me. * * * He was not a dead beat. He always tried to pay his bills. * * * Mr. La Du helped me about the house with the housework. He wiped the dishes for me sometimes. I do not know that he ever washed the dishes. Once in a while he turned the wringer while washing the clothes. I did not have to ask him; he was very kind. He did not volunteer much after we left the flat while I was in a delicate condition. He was very kind to help me, while we were living in the flat and while I was in my delicate condition. I would say that Mr. La Du did all he could to help me. He could have used more affection and helped me that way. I never required him to do the housework. I expected to take care of that part myself. * * * Mr. La Du always kissed me when he left the house, because I expected it. Sometimes it lacked affection, but he always went through the form. In my mind it was not done in the proper spirit."

She defined her grounds for divorce as follows:

"Specifically that cruelty consists in his failure to treat me nicely and affectionately, and at times he treated me crossly, and his financial failure to provide for me as stated here in my testimony."

Her general charge of financial failure to provide for her is not borne out by the record. His earnings are shown to have been fairly devoted to their family finances and payment on property taken in both their names. He first bought in their joint names a pleasant home, which was comfortably furnished, where they lived until she left him. While together they had an account with a leading grocer, upon which she could order as she saw fit. They had a joint bank account, upon which she could draw at any time. That she was a capable housekeeper, made their home attractive, and managed their household affairs economically is not questioned. She was equally interested with him in their joint prosperity, and while living together each evidently had confidence in and co-operated with the other for their common welfare. The following statement by defendant as to their financial affairs is fairly sustained by the record and supported by her testimony in many particulars:

"I was not laying aside any savings account of any kind, any money unknown to her, in which she did not have a share. She and I were on the same basis so far as family finances were concerned. We have had a joint bank account in which both our names were good at the bank practically ever since we were married. It was the State Savings Bank. There was always a balance there. Sometimes large, and sometimes small. It was never overdrawn. Mrs. La Du was at liberty to draw checks on that account. The bank was informed her signature was good. It was never refused that I know of. She drew checks on account. We usually had one check book, and sometimes I had the check book and sometimes it was home. When I was away from home it was always left home. * * * I never refused her money or a check when I had it."

It was shown that she drew numerous checks on this account for a variety of proper purposes in connection with their family expenses, including butcher, light, and fuel bills, decorating, repairs, building and loan payments, books, wearing apparel for herself, etc. She admits there was no limit to the amount she could order on the grocery account, and her husband did not limit her on the amount she could spend for clothes, but states he would sometimes ask her, "Do you have to pay that much for it?" which naturally offended her.

The charge is made in her bill that defendant neglected and refused to provide her necessary and proper medical attendance at the time of her confinement and later. If fairly put in issue by conflicting testimony, this would call for most serious consideration, but the farthest her testimony suggests in that direction is lack of proper manifestations of sympathy and solicitude for her, which he strenuously denies. It appears from her own testimony that at the time of her serious illness during confinement she was provided with two trained nurses, and three physicians attended her. Of this she says:

"During my confinement I think he did all that was expected at that time. He did not neglect or refuse to provide medical attendance."

But she claims that he was indifferent about and neglected to provide for a subsequent surgical operation, which the physicians advised, to relieve her of conditions resulting from her confinement. The operation was not performed, and their testimony is at variance as to defendant's active interest in providing for, or favoring it, but the physician she at one time expressed a preference for testified that defendant consulted him regarding the matter; that an examination was held and arrangements were made for him to perform an operation, and Mr. La Du seemed quite

anxious to have it, but it was not carried out, and witness did not know why. Defendant testified that he had raised money on his life insurance, and told his wife she could then have the operation if she desired. This she does not deny, and admits she was at that time relying on Christian Science, saying:

"I thought if I could make it do it would save expense. * * * Immediately after the examination by Dr. Russell when the subject of operation was up I began to take Christian Science treatments to relieve myself."

We find no occasion to disagree with the findings and conclusion of the trial court that, eliminating from consideration defendant's evidence, plaintiff has failed to *prima jucie* present such a case of extreme cruelty and failure to provide as charged in her bill, or recognized by the courts as constituting legal ground for divorce.

Defendant has not appealed from dismissal of his cross-bill. His only indicated grievance against his wife is the charges which she made against him and her refusal to return to him, which are not now here for review or consideration beyond their connection with her demand for divorce.

The decree is affirmed, without costs.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.